UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| United States of America, | § | |
|     Plaintiff, | § | |
| | § | |
|     v. | § | No. SA-20-CR-437-OLG |
| | § | |
| Juan Ramon Hernandez-Limon | § | |
|     Defendant. | § | |

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

TO THE HONORABLE CHIEF JUDGE ORLANDO L. GARCIA:

The United States of America, by and through the undersigned Assistant United States

Attorney, submits this response to the defendant's Motion to Suppress Evidence (ECF No.

22).

**I.       Procedural History**

On September 23, 2020, the United States indicted the defendant in the above captioned

cause for Illegal Reentry in violation of 8 U.S.C. § 1326(a) and Alien in Possession of a

Firearm in violation 18 U.S.C. § 922(g)(5).  Defendant filed his Motion to Suppress Evidence

(ECF No. 22) on November 18, 2020.  On November 23, 2020, the Court, via text order,

granted the Government's Motion to Extend Time to File a Response (ECF No. 23), extending

the time for the Government to file its response to December 9, 2020.

**II.       Factual Summary**

Should the Court hold an evidentiary hearing on this matter, the Government will elicit

the following testimony:

On July 12, 2020, Border Patrol Agents at the Laredo West Border Patrol Station

intercepted an alien smuggling operation and discovered that, prior to apprehension, one of the

individuals involved in the smuggling operation made repeated phone calls to a telephone number associated with the defendant. The Border Patrol Agents conducted additional investigation and concluded that the defendant was an alien present in the United States without lawful permission, who had previously been removed from the United States. The Border Patrol Agents also found social media postings showing the defendant in possession of firearms. The Border Patrol Agents notified ICE Fugitive Operations, who determined that the defendant was living at 7220 Marbach Road, Apartment 108, in San Antonio, Texas.

On August 24, 2020, while surveilling the area around the defendant's apartment, ICE Fugitive Operations Officers identified the defendant as he approached and entered his vehicle a little before 5:00 a.m. The ICE Officers turned on their emergency lights and drove their vehicles up behind the defendant's vehicle, blocking him in to his parking space. The ICE Officers approached the defendant as he sat in his car and Officer Michael Dryja asked the defendant to provide his name, which the defendant did. Having confirmed his identity, Officer Dryja asked the defendant to exit his vehicle, and again the defendant complied. Officer Dryja then asked the defendant if he had lawful permission to be in the United States and if he had previously been removed. The defendant responded that he did not have permission to be in the United States and had been removed previously. Accordingly, the Officers arrested the defendant, placed him in handcuffs, and conducted a pat-down. The defendant stated that he had a bag of marijuana in his pants, which Officer Dryja removed. The Officers then placed the defendant in the back seat of Officer Dryja's police vehicle, and Officer Dryja notified the defendant of his *Miranda* rights. The defendant replied that he understood his *Miranda* rights. Officer Dryja estimates that less than three minutes elapsed from the time that the ICE Officers pulled up behind the defendant's car until the time they placed him under arrest and read him

his *Miranda* rights.

Officer Dryja next asked if the defendant had any firearms, to which the defendant replied yes. Officer Dryja asked the defendant where the firearms were located, and the defendant responded that the firearms were in the bedroom of his apartment. Officer Dryja asked if the defendant would consent to allowing him to enter the apartment to retrieve the firearms, to which the defendant agreed, consenting to allowing the officers to enter his apartment.

Thereafter, given that they did not have the minimum number of personnel required by ICE policy to make entry into the apartment, Officer Dryja requested assistance from local San Antonio Police Department officers so that SAPD personnel could assist while the ICE Officers entered the apartment. After approximately 15-20 minutes, the SAPD Officers arrived, at which point the SAPD officers recorded their interactions with the ICE Officers and the defendant on their SAPD-issued body cameras. The ICE Officers were not wearing body cameras.

When the SAPD Officers arrived, they met Officer Dryja and the other ICE Officers in the parking lot of the defendant's apartment complex a few dozen yards from where the defendant was detained in Officer Dryja's vehicle. Officer Dryja informed the SAPD Officers that the defendant had provided consent to enter his apartment to get the firearms. Officer Dryja explained that he planned to bring the defendant with him to the defendant's apartment while the ICE Officers conducted the search, given that the defendant had given consent. The two SAPD Officers wearing body cameras were standing behind the vehicle when Officer Dryja entered the driver's side door of his car. Officer Dryja next walked over to the rear passenger side of his vehicle and began speaking with the defendant.

Large parts of the SAPD body camera recordings of the conversation between Officer Dryja and the defendant are inaudible or only partially audible, given the distance from the SAPD body cameras, background noises, and that the defendant was wearing a mask to reduce the risk of COVID-19 transmission. The following description of that conversation includes excerpts from what is audible on the body camera recordings and the anticipated testimony of Officer Dryja's descriptions of his conversation with the defendant. As an exhibit to this Response, the Government has provided CDs containing the body camera video from the SAPD Officers in this case, Officer Jose Alfredo Lopez and Officer James Martinez. In addition to original versions, Exhibits A and B respectively, the Government has provided versions A-1 and B-1 with enhanced audio quality, making some of the audio easier to hear.

When the first SAPD Officer, Officer Lopez, arrived, Officer Dryja greeted him, thanked him for coming out, and explained that the defendant admitted to having handguns in his apartment and had given consent to enter the apartment to retrieve the guns. Ex. A-1, Officer Lopez's Body Camera, 3:15-4:00 (all citations to the body camera videos refer to the run-time of the video, not to the timestamp within the video itself). All the Officers approached the vehicle where the defendant was located. Officer Dryja walked first to the driver's side front door, then around to the passenger's side rear door to talk to the defendant and ask him which key would open his apartment door.

The defendant appears to have asked, "Do you have a warrant to go in there? Are you allowed to go in there?" Ex. B-1, Officer Martinez's Body Camera, 5:42-5:50. Officer Dryja responded, "You told me we could." *Id.* Officer Dryja told the defendant that he had given consent to enter about 15-20 minutes earlier. The defendant then offered that he (the defendant) was willing to go in and retrieve the guns from his own apartment. Ex. A-1, 5:40-6:05. Officer

Dryja responded, "We can't have that," and stated that he was focused on retrieving the guns. *Id.* The defendant appears to express concern about his brother and the "weed" in his apartment, to which Officer Dryja responds that he is not interested in the "weed" and will not harm his brother. The defendant then said, "I'm not giving you consent to go in there." Ex. A-1, 7:04-7:07. Officer Dryja can then be heard asking, "How come?" *Id.* The defendant responded that the Officers were trying to trick him so that they could charge him for the marijuana he possessed. *Id.* 7:07-7:45. Officer Dryja explained that he wanted to go in "to get the guns out of there." Ex. B-1, 7:05. Officer Dryja told the defendant, "I don't care about that," referring to the marijuana, "We are throwing that [marijuana] in the garbage and you are going to watch us throw it in the garbage." *Id.* 7:46-7:55.

Officer Dryja will testify that the defendant again consented to allow the Officers to enter the apartment to retrieve the guns after he had assured the defendant that he only wanted to enter the apartment for the guns. Specifically, Officer Dryja reassured the defendant that he was not intending to charge the defendant for the marijuana he possessed and would not harm his brother. *See* Ex B-1, 8:15-8:55 (Officer Dryja can be heard providing assurances to the defendant). Much of this conversation between the defendant and Officer Dryja, particularly the defendant's side of the conversation, is inaudible on the body camera videos. However, Officer Dryja will testify that the defendant consented to allowing the Officers to enter and take the guns.

Thereafter, Office Dryja helped the defendant out of the vehicle, at which point the defendant stated, "Can I just take two guys? I don't want to take everybody, you know what I mean….Make me look bad in front of my neighbors." Ex. B-1, 9:06-9:20. The Officers explained that they all had to go as a "safety issue." *Id.* The defendant then said, "You said you

are going to let me use my phone, right?" Ex. A-1, 9:33-9:36. Officer Dryja explains that, yes, he will allow the defendant to use his phone. *Id.* at 9:36-9:38. The defendant says, "I don't believe you, y'all trick me." *Id.* Officer Dryja assures him, that he'll let him use his phone saying, "I'm not going to trick you, my man….Trust me, you are going to get to use your phone." *Id.* at 9:40-10:01. The defendant then asked if he would be allowed to use his phone to call his parents, to which Officer Dryja again agrees and assures him that he will be allowed to use his phone. *Id.*

Thereafter, the ICE Officers, SAPD Officers, and defendant all walked to the defendant's apartment, with one ICE Officer guiding the defendant by the arm. On the way, the defendant asked if he could be the one to wake up his brother. *Id.* at 10:05. Officer Dryja will testify that the officers explained that they could not let the defendant do that. All of the Officers and the defendant ascended the stairs to the defendant's second story apartment unit, at which point one of the Officers asked the defendant to provide his brother's name and the defendant replied "Miguel." *Id.* at 10:54-11:03.

The ICE Officers then entered the apartment using the defendant's key, while the SAPD Officers and the defendant remained on the landing area outside the apartment door. As the ICE Officers entered, the defendant told the officers which bedroom to go to so that they could find his brother. *Id.* at 11:15. The Officers located his brother, told him to "show your hands," moved him into a different room, and completed a brief protective sweep. The ICE Officers entered the defendant's room to retrieve the guns, which the defendant had told Officer Dryja would be located in his closet. Officer Dryja entered the defendant's bedroom and immediately saw the handguns located on a top shelf in the defendant's closet and a shotgun leaning against a wall in the bedroom. He also observed several baggies, which he assessed to contain

marijuana, on the floor near the defendant's bed. The search from the time of entry, securing the defendant's brother, performing the protective sweep, and to locate the guns took approximately two minutes. During this search, Officer Dryja did not open drawers or otherwise conduct a search beyond what was in plain sight. After approximately two minutes, having located the guns, the ICE Officers concluded their search and all moved into the living room with the defendant's brother while waiting for a HSI Agent to arrive and process the guns.

The SAPD Officers and defendant remained outside on the landing areas for approximately 25 minutes while the ICE Officers were inside the defendant's apartment. During this time, the defendant and the SAPD officers discussed the defendant's job doing metal work for construction of new H.E.B. stores, *id.* at 13:20-14:00; the defendant spoke with his brother briefly, *id.* at 14:35-14:42; the SAPD Officers exchanged light banter; the defendant coughed under his mask and then joked with Officer Lopez saying, "It's the Corona," *id.* at 25:30-25:40; the defendant and Officer Lopez discussed the inconvenience of wearing masks, *id.* at 29:40-30:40; the defendant told Officer Lopez that some officers are rude, but "you all are cool," *id.* at 31:10-32:00; and the defendant joked again with Officer Lopez and then told Officer Lopez that he "has been here his whole life" and they discussed guns, *id.* at 32:30-34:50. Eventually, the defendant went off camera into the apartment to wait with the ICE Officers while HSI Agent completed his work, *id.* at 34:55. Approximately 25 minutes after arriving at the defendant's apartment, Officer Dryja emerged and told the SAPD Officers about the guns and marijuana found in the defendant's apartment and that they could leave the scene.

### III.   <u>Argument</u>

The defendant alleges two grounds for suppression in his Motion. First, that his Fifth Amendment rights against self-incrimination were violated when the ICE Officers approached

him in his car prior to arrest and again when they questioned him after arrest in Officer Dryja's vehicle. Def. Mot. 9. Second, that his Fourth Amendment protections against unlawful search and seizure were violated. The defendant argues that Officers searched his apartment without a warrant, that he never consented to the search of his apartment, and that he revoked his consent to search his apartment before the Officers conducted the search. Def. Mot. 5-8. As detailed below, the defendant's allegations are without merit. The body camera videos and the testimony that the Government will illicit from Officer Dryja at an evidentiary hearing will demonstrate the Officers advised the defendant of his *Miranda* rights in a timely fashion and that, upon receiving the defendant's voluntary consent, the Officers searched his apartment within the scope of consent provided.

### a. Defendant's Pre &Post Arrest Statements Are Admissible

#### i. Pre-Miranda, Non-Custodial Statements

Officer Dryja will testify that the defendant was not in custody at the time the defendant provided his identity, admitted that he was not lawfully present in the United States, and confirmed that he had previously been removed from the United States. All of which were statements made by the defendant before Officer Dryja was required to administer *Miranda* warnings.

The Government must provide *Miranda* warnings prior to a custodial interrogation. *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir.1988) (en banc) (citing *Miranda v. Arizona*, 384 U.S. 436, 479, (1966)). "A suspect is ... 'in custody' for Miranda purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* at 596. "Two discrete inquiries are essential to the

8

determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (*quoting J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)).  The determination regarding whether a defendant was in custody is based on the totality of the circumstances.  *Id.*

Officer Dryja will testify that the defendant was sitting in his car when the ICE Officers approached him and asked his name.  After confirming the defendant's identity, Officer Dryja instructed the defendant to exit the vehicle, at which point Officer Dryja asked him basic questions relevant to determining if the defendant was in violation of the law, as suspected by the ICE Officers, including whether he had lawful permission to be in the United States and whether he had previously been removed.  At this point, when Officer Dryja asked these questions, the defendant was not handcuffed, only his vehicle was blocked into its parking space.  The defendant admitted that he did not have lawful permission to be in the United States and had previously been removed.  This situation is akin to a typical traffic stop, in which officers briefly stop and question suspects, which are considered to be non-custodial events. *See United States v. Ortiz*, 781 F.3d 221, 232 (5th Cir. 2015) (describing "an ordinary traffic stop" as "a situation in which a suspect is not in custody") (*citing Berkemer v.McCarty*, 468 U.S. 420, 440 (1984)).  The proper analysis for this situation is as an investigative detention under *Terry*, in which officers may ask a suspect a "moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *McCarty*, 468 U.S. at 439 (referencing *Terry v. Ohio*, 392 U.S. 1, 29 (1968)).  Given the brevity of the interactions, less than five minutes, that they occurred in a public place in the defendant's parking lot, and that the questions were tailored to the officer's suspicions, the Officer's actions

were governed by *Terry* and they were not required to provide *Miranda* warnings at this point.

Since the defendant was not in custody when he made his pre-*Miranda* statements, the defendant's Fifth Amendment rights were not violated and his pre-arrest statements should not be suppressed.

*ii. Post-Miranda Statements Made Voluntarily*

As to the defendant's statements made after Officer Dryja provided notice to the defendant of his *Miranda* rights, Officer Dryja's testimony will show that the defendant made these statements voluntarily, knowingly waiving his Fifth Amendment rights.

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v Thompkins*, 560 U.S. 370, 382-383 (2010) (*quoting North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (*quoting Moran v. Burbine*, 475 U.S. 412, 421 (1986)). However, *Miranda* "does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 385. The government is held to the preponderance of the evidence standard when attempting to demonstrate waiver of *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Officer Dryja will testify that he notified the defendant of his *Miranda* rights immediately after the arrest, just after handcuffing the defendant and placing him in the back of his police vehicle. Officer Dryja will testify that the defendant stated that he understood his *Miranda* rights; thereafter, the defendant stated that he owned handguns and kept them in his apartment bedroom; and that during this conversation none of the officers coerced the defendant into making those statements.

Officer Dryja's testimony will corroborate what is evident in the body camera videos. Specifically, that the defendant knew and understood English and was able to communicate effectively with the Officers. Therefore, the defendant knew and understood the *Miranda* rights when Officer Dryja explained them to him. Having been informed that he could remain silent, the defendant's actions in responding to Officer Dryja's questions evidence a waiver of that right. Officer Dryja's demeanor, and that of the other Officer's present, was respectful and polite. The Officer's weapons were not drawn and their voices were not raised. In short, when the defendant chose to speak after receiving his *Miranda* warnings, that he did so represented a "deliberate choice" to voluntarily waive those rights upon which the government may rely.

**b. Defendant's Consent to Search**

Officer Dryja will testify that the defendant consented to the search after he had assured the defendant that the Officers would limit their search to guns, which the defendant had confessed to having in his apartment. Officer Dryja will explain that the defendant initially consented to the search, but the defendant later expressed reservations and concerns that his brother would be harmed and that drug charges could be brought against him. Officer Dryja will testify that, in hindsight now knowing that the defendant had more marijuana in his apartment than the single bag that the Officers found during the arrest, the defendant was likely

concerned that the larger amount of marijuana in his bedroom would lead to drug-related charges and this concern may have been what prompted the defendant to withdraw his consent. However, Officer Dryja will also testify that the defendant subsequently renewed his consent to the search after Officer Dryja made adequate assurances that he would limit the scope to the guns.

While the Fourth Amendment generally requires the government to obtain a warrant to search a home, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted). "When courts review a search justified by consent, there are four distinct issues." *United States v. Freeman*, 482 F.3d 829, 831 (5th Cir. 2007). "First, as a threshold matter, the government must demonstrate that the defendant did consent." *Id.* at 831–32 (citing *United States v. Price*, 54 F.3d 342, 345–46 (7th Cir. 1995)). Second, if the Government is successful in demonstrating consent, the Government must next demonstrate that the defendant consented voluntarily. *Id.* at 832 (citing *Schneckloth*, 412 U.S. at 222). Third and fourth, the Government must show that "the search was within the scope of consent" and that "the consenting individual had authority to consent." *Id.*

### i. Threshold: The Defendant Consented

Officer Dryja will testify that the defendant first consented to the search shortly after the arrest, prior to the arrival of the SAPD Officers, and again after the SAPD Officers arrived, immediately before Officer Dryja helped the defendant out of the vehicle so that the defendant could accompany the Officers during the search.

The question of whether the defendant did offer his consent to search is determined based on the "totality of circumstances." *Id.* at 832. The body camera videos corroborate

Officer Dryja's anticipated testimony and show him, immediately upon arrival by SAPD Officers, telling the other Officers that the defendant had unequivocally given him consent to search. Officer Dryja repeats that he had received consent several times both without provocation and in response to a question from another officer. Once Officer Dryja returns to the vehicle, the body camera videos and Officer Dryja's testimony will corroborate that the defendant changed his mind, saying "I'm not giving you consent to go in there." Ex. A-1, 7:04-7:07. Officer Dryja then asks "how come" and the two continue to talk for two more minutes before the Defendant again consents to the search and Officer Dryja helps him out of the car.

Given that the defendant had previously given consent, Officer Dryja acted reasonably in continuing to talk with the defendant to understand why he had changed his mind. Officer Dryja will testify that he determined that the defendant was worried that the Officers were trying trick him so that they could prosecute him for the marijuana that the defendant had in his apartment or that they might harm his brother, who was sleeping in a different bedroom. Officer Dryja will testify that he provided assurances to the defendant that the Officers were not looking to harm or prosecute his brother and that they were not interested in bringing marijuana possession charges. Thereafter, the defendant reinstated his consent to search.

It is evident from the defendant's own demeanor and course of conduct after saying, "I'm not giving you consent to go in there," that the defendant had subsequently consented to the search. During that 25 minute time recorded on the body cameras, the defendant does not make any statements or comments suggesting that the Officers are searching his apartment without permission, which you would expect to have heard given the amount of dialogue by the defendant and his prior statement, unless he had actually decided to allow the search.

Instead, the defendant can be heard confirming with Officer Dryja that he would be

allowed to call his parents and still attempting to persuade the officers to allow him to wake up his brother himself.  After the defendant exits the police car as they walk to the apartment, the defendant's words and behavior show someone who is continuing to try to bargain for more concessions (in addition to those already agreed to, namely not harming his brother, not bringing marijuana charges, and allowing calls to his mother).  Once he arrived outside his apartment door, the defendant never expressed additional reservations or made any protests of the search that he was witnessing.

Viewing the defendant's and the Officer's actions based on the totality of the circumstances, rather than as a brief snapshot, it is evident that the defendant ultimately consented to the search that occurred.  The defendant's motion asks the court to focus on two of his statements in isolation:  (1) where the defendant asked Officer Dryja if he has a warrant and "is allowed to go in there," Ex. B-1 5:42-5:50 and (2) "I'm not giving you consent to go in there."  Ex. A-1, 7:04-7:07.  However, Courts are required to make this determination based on the totality of circumstances, which in this case shows a more complex situation in which the defendant realized that he could use his consent to search as means to limit the evidence and charges that the Officers could bring.  Once he was satisfied that Officer Dryja would stick to his word, the defendant voluntarily consented to a narrowly scoped search that did not result in any of the marijuana charges or harm to his brother that the defendant sought to avoid.

### ii.  Second:  Voluntariness of the Consent

When determining the voluntariness of a consent, the question is whether a reasonable person in the defendant's position would have felt free to decline the Officer's request. *Florida v. Bostick*, 501 U.S. 429, 435–36 (1991). Courts consider six factors when making the voluntariness determination:

(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Olivier–Becerril*, 861 F.2d 424, 426 (5th Cir. 1988). All of the factors should be considered and "no one of the six factors is dispositive or controlling." *Id.*

(1) When the defendant initially provided consent prior to the arrival of the SAPD Officers and in his subsequent conversations with Officer Dryja, the defendant was in custody and handcuffed in the back of a police vehicle.

(2) The defendant was not subject to coercive police procedure, as evidenced by his discussions with Officer Dryja. Throughout the discussions, Officer Drjya is polite and does not use an aggressive or authoritative tone. Officer Dryja will testify that he did not threaten the defendant; rather, he acquiesced to the conditions requested by the defendant, except where those requests would have put someone in danger, such as when the defendant asked retrieve the firearms himself. Far from using coercive tactics or threatening additional charges, Officer Dryja took a patient, listening approach and repeatedly assured the defendant that he would limit the scope of the search to the guns in the apartment. During this time, the Officers did not point their weapons at the defendant or seek to intimidate him.

(3) The defendant assisted in the search by telling officer Dryja that the guns were located in his bedroom. Additionally, the body camera shows the defendant cooperating with the police throughout the search, pointing out his brother's bedroom without prompting, and providing his brother's name as the officers enter his apartment.

(4) That the defendant was aware he could refuse consent is obvious from the defendant's own statements and the body camera footage showing the defendant using his consent as a negotiating tool to limit the Officer's search.

(5) Relatedly, the defendant's statement asking if Office Dryja had a warrant and his ability to negotiate the scope of the search demonstrate that the defendant is educated and intelligent, at least as far as his Fourth Amendment rights are concerned. The body camera footage also records the defendant saying that he has lived in the United States most of his life, including going to school here. The defendant spoke English fluently with the officers, and spoke in English to his brother, indicating that he had no issues with a language barrier.

(6) While the defendant did know that the Officer's would find marijuana and firearms in his apartment, the Defendant had mitigated the risk of such a discovery by limiting the search to only guns, which he had already confessed to possessing.

Only the first factor weighs against finding that the defendant's consent was voluntary, and that one factor is significantly outweighed by the facts in this case that support the other factors. Courts routinely find that consent is voluntary even when the defendant gives it while in custody. *See e.g., United States v. Medina*, 2020 WL 4060780 (W.D. Tex. July 20, 2020); *United States v. Saldana*, 2015 WL 868975 (W.D. Tex. Feb. 27, 2015); *United States v. Canales*, 2012 WL 566649 (W.D. Tex. Feb. 21, 2012); *United States v. Benavides*, 2010 WL 5373884 (W.D. Tex. Dec. 21, 2010). The remaining factors weigh strongly in favor of a finding that defendant's consent was voluntary considering the totality of the circumstances. The body camera videos and Officer Dryja's testimony will demonstrate that the defendant knew and understood that his options included withholding consent, but that he ultimately

calculated that the benefits he would likely receive were worth the cost. He made this decision without fear of the Officers and was satisfied that he had effectively limited the scope of their search.

Lastly, Officer Dryja will testify that after the defendant was taken in by the ICE Officer for processing, he continued to cooperate and signed an affidavit acknowledging receipt of his *Miranda* rights, admitting that he was in the United States without authorization after being previously removed, and that he owned the specific listed firearms that were found in his apartment. The defendant's entire course of conduct evidences that he was cooperating with the Officers from the initial contact through to processing.

### iii. Third: Search Executed within the Scope of the Consent

Officer Dryja will testify that although he found marijuana on the defendant at the time of the arrest and larger amounts of marijuana in the defendant's apartment, in keeping with the scope of consent dictated by the defendant, he did not pursue drug charges. Similarly, Officer Dryja will testify that, in keeping with his discussions with the defendant, he did not investigate whether the defendant's brother had lawful status to be in the United States and allowed him to make multiple calls. At no point did the defendant object to the scope of the search after he consented to allow it. *See United States v. Sarli*, 913 F.3d 491, 495 (5th Cir. 2019) (explaining that "[w]here there is ambiguity regarding the scope of a consent, the defendant has the responsibility to affirmatively limit its scope.").

### iv. Fourth: Defendant Had Authority to Consent

Officer Dryja will testify that he obtained the apartment key from the defendant, showing that the defendant had access to the apartment, and that the defendant had expressed that it was his apartment. Further, Officer Dryja was aware that another Officer had confirmed

that the defendant was on the lease of the specific apartment unit.

### c. Inevitable Discovery

Should the Court find that any evidence obtained in the search of the defendant's apartment was obtained without the defendant's consent, the Government contends that suppression is unwarranted under the inevitable discovery doctrine. "[T]he inevitable discovery doctrine ... renders the exclusionary rule inapplicable to otherwise suppressible evidence if that evidence would inevitably have been discovered by lawful means." *United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010). In the Fifth Circuit, the standard is typically described as a two-part test requiring that the government must establish by a preponderance of the evidence that "(1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." However, the "'active-pursuit element' may no longer be necessary to invoke the inevitable discovery rule". *Id.*; *See also United States v. Lamas*, 930 F.2d 1099, 1104 (5th Cir. 1991) ("Whether this active-pursuit element from *Cherry* is still necessary to implicate the inevitable-discovery rule must await the case that turns on that question.")

In this case, Officer Dryja will testify, and the body camera videos corroborate, that he understood that he did not have a warrant, but opted not to request a warrant because he had obtained the consent of the defendant to conduct the search. Given that the defendant had already made post-*Miranda* statements admitting that he was an unlawful alien, who owned firearms, and had specified the location within his apartment, Officer Dryja will testify that he would expect to be able to obtain a search warrant based on those representations. A case such as this, where law enforcement officers in the field elect not to get a warrant based on their

good-faith reliance on what they reasonably perceive to be consent from the defendant, is a type

of case in which the second prong of the inevitable discovery standard should not be required.

**IV.     Evidentiary Hearing**

Should the Court conduct an evidentiary hearing, the Government will offer the

testimony of witness(es) in support of its case, including and not limited to, Officer Dryja.

WHEREFORE, PREMISES CONSIDERED, the United States prays that the Court

DENY the Defendant's Motion to Suppress Evidence (ECF No. 22).


Respectfully submitted,

GREGG N. SOFER
UNITED STATES ATTORNEY


_____
Kelly Stephenson
Assistant United States Attorney
Texas Bar # 24079823
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7100

<u>CERTIFICATE OF SERVICE</u>

I certify that on December 9, 2020, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System, which will transmit notification of such filing to counsel of record to Defendant **Juan Ramon Hernandez-Limon**.

*/s/*_____
Kelly Stephenson
Assistant United States Attorney

United States District Court
Western District of Texas
San Antonio Division

United States of America,
     Plaintiff,

v.

Juan Ramon Hernandez-Limon,
     Defendant.

No. SA:20-CR-437-OLG

## ORDER

Having considered the Defendant's Motion, the Governments Response, and after considering the entire record, the Defendant's Motion to Suppress Evidence (ECF No. 22) is **DENIED**.

SIGNED AND ENTERED this_____, 2020.

_____
UNITED STATES DISTRICT JUDGE